**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
GEORGE JANETOS, IRENE JANETOS,

                    Plaintiffs,

          - against -

HOME DEPOT U.S.A., INC.,

                   Defendant.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**

CV 09-1025 (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

In this personal injury action, Plaintiff George Janetos ("Plaintiff" or "Janetos") alleges that he was injured at a Home Depot U.S.A., Inc. store ("Defendant" or "Home Depot") in Jericho, New York. Plaintiff claims that his injuries resulted from unsafe conditions allegedly caused by Home Depot's negligence. Although the Complaint does not specify what the unsafe conditions were, the additional submissions in this case set forth Plaintiff's theory that he was injured when a bay of improperly stacked doors shifted from their position and hit him. Plaintiff Irene Janetos ("Mrs. Janetos"), the wife of George Janetos, asserts a loss of consortium claim. Before the Court is Plaintiffs' motion for summary judgment. Having considered the Complaint, the parties' written submissions, and the applicable case law, the Court DENIES the motion for summary judgment for the reasons that follow.

I.    **B**ACKGROUND

Because Plaintiffs did not submit a proper Rule 56.1 Statement (*see* discussion below) it is difficult to tell which facts are actually disputed. Therefore, the Court has looked to the record itself in preparing the following description of events, specifically the testimony and documentary evidence attached to the Affirmation of Plaintiffs' counsel, William T. Bellard

("Pl's. Aff.") [DE 37-1 - 37-2], on which both parties rely.  Relevant discrepancies in the evidence are noted.

### A.  The Accident

On the morning of August 18, 2008, George Janetos went to Home Depot with his brother-in-law's wife, Olympia Parais.  *See* Tr. of George Janetos Dep., Ex. E to Pls.' Aff. ("Janetos Tr.") 18-19; Tr. of Olympia Parais, Ex. L to Pls.' Aff. ("Parais Tr.") at 6.  The purpose of the visit was for Janetos to assist Parais in purchasing some doors for her home renovation.  *See* Janetos Tr. at 19.  Janetos and Parais arrived at the store between 9:00 and 10:00 in the morning and proceeded to the door aisle.  *See* Parais Tr. at 5; Janetos Tr. at 21-22, 24. The door aisle, Aisle 23, is located in Home Depot's Millwork Department.  *See* Tr. of Michael Gregus Dep., Ex. H to Pls.' Aff. ("Gregus Tr.") at 22.  There were approximately four to five other customers in the aisle when Janetos and Parais arrived, but no employees.  Janetos Tr. at 22, 24. Prior to the incident at issue, two customers were viewing the bay of doors Janetos and Parais wished to examine.  Janetos Tr. at 25-26; Parais Tr. at 8-9.  Janetos and Parais waited until those customers were finished before approaching the bay.  *Id*.  Janetos could not recall whether the other customers were touching or moving the doors, but both he and Parais recalled that the other customers had a cart with them.  Janetos Tr. at 26; Parais Tr. at 22.  When the customers left, Janetos and Parais approached the doors and within a few seconds, the accident occurred. Janetos Tr. at 29; Parais Tr. at 9.  Prior to the accident, neither Janetos nor Parais moved the doors.  Parais Tr. at 21.

Janetos described the accident as follows:  "The doors fell on me and I was trying not to hit my head.  They threw me to the floor and after that I don't remember."  Janetos Tr. at 35.  The

doors did not entirely fall out of the bay, but rather the top part of the doors fell forward, hitting Janetos, while the bottom portion remained secure. *Id*. at 36-37. Janetos stated that there were "seven or eight or ten" doors and that they fell on him "like a domino." Janetos Tr. at 34, 36. He further testified that when he initially approached the doors, he did not see anything which warned him that there could be an accident. Janetos Tr. at 34.

Parais described the incident as follows:

> We stopped. Maybe not even five seconds passed, and the doors came cascading down one after the other hitting George. George had the mind of putting up his hands, um, to protect himself. I thought there was only one door. I tried to reach out to stop it. . . . There must have been, oh, at least six, seven doors. I mean, it happened really fast. Next thing I know, George was on the floor. I didn't know whether he was conscious or not.

Parais Tr. at 9-10. Parais explained that after the accident, she "called" and "somebody came," referring to an employee of Home Depot. *Id*. at 12.

According to Orlando Silva, Jr., a Home Depot employee, the doors that fell on Janetos weighed between 40 and 50 pounds each. *See* Tr. of Orlando Silva, Jr. Dep., Ex. F to Pls.' Aff. ("Silva Tr.") at 27-28. Another employee, Michael Gregus, the head of the Millwork Department at the time, stated that the doors weighed between 30 and 40 pounds. Gregus Tr. at 17, 36.

Gregus described the incident as follows:

> I was standing by the Millwork desk which is towards the front of the aisle. I heard somebody yell, turned around saw probably anywhere between six and eight doors slabs falling forward and it hit a gentlemen in the shoulder. They stopped because the bottom beam hit the bottom of the doors, they didn't come all the way down. It did strike him in the shoulder and he fell to the ground and we were all like running over. We all went running to help.

Gregus Tr. at 23. Gregus testified that he saw Janetos fall. *Id*. at 38. However, this testimony differs from the earlier written statement Gregus prepared regarding the accident. The written statement reads as follows:

> I (Mike Gregus) was helping a couple down aisle 23 with Bi-fold doors. I heard a commotion, turned around, and saw the customer on the floor holding his shoulder. The doors the [sic] fell were leaning and did not fall fully to the floor. I ran over and with another customers assistance, secured the doors so they would not fall and hit the customer again. After that, we helped the customer to his feet, I got him a stool to sit on, asked him if he needed anything and called an ASM over.

Pls.' Aff., Ex. I; Gregus Tr. at 26-27. Gregus further testified that it was the sound of a scream which brought his attention to the incident. Gregus Tr. at 37.

Parais testified that she was also injured in the accident, but the record is not clear as to how her injury occurred or whether the doors hit her as well. *See* Parais Tr. at 8.

## B.    After the Accident

After the accident, Gregus testified "I got [Janetos] a stool or a chair, I asked him if he needed some water and I told him to take a couple of deep breaths and relax for a minute before I call the manager." Gregus Tr. at 42. Janetos testified that although Parais requested a chair, nobody brought one. Janetos Tr. at 49-50. Parais recalled requesting a stool or something for Janetos to sit on, but stated that she did not remember if a Home Depot employee ever brought anything. Parais Tr. at 11. She also testified, however, that after the accident, Janetos sat on something that she believed to be either a stool or a cart. *Id*. at 11-12.

Joann Bakal-Lomena, the Home Depot manager on duty on the date of the accident, undertook the task of filling out the appropriate paperwork documenting the accident. *See* Tr. of

Joann Bakal-Lomena, Ex. J to Pls.' Aff. ("Bakal-Lomena Tr.") at 14.  Bakal-Lomena met with Janetos and Parais in a conference room in order to gather the information she needed.  *Id*. at 29. She recalled that the task was "a little difficult" because Janetos and Parais "didn't speak very good English."  *Id*. at 14.  Janetos immigrated to the United States from Greece in 1996.  Janetos Tr. at 7.  He testified that he does not speak very much English and does not read or write any English.  *Id*. at 6-7.  Most of Bakal-Lomena's conversations were with Parais since "she spoke better English than [Janetos] did."  Bakal-Lomena Tr. at 29.  Janetos testified that he was in a lot of pain during the meeting and Parais had to translate Bakal-Lomena's questions.  Janetos Tr. at 51-52.

Bakal-Lomena filled out the Customer Incident Statement form regarding the accident, which Janetos then signed.  *See* Janetos Tr. at 59; Bakal-Lomena Tr. at 30.  Although Bakal-Lomena filled out the "Described What Occurred" section of the form, she did not actually see the accident.  Bakal-Lomena Tr. at 28.  In that section, she wrote: "looking at doors and moving and other customers took 4 stores & cust took doors the doors stacked behind the front doors fell forward and hit customer in his Right shoulder."  Pls. Aff., Ex. K.  The phrase "moving and other customers took 4 stores & cust took doors" is written in slanted font above the other words and is inserted after the fourth word with an arrow.  *See id.*  Bakal-Lomena stated that she did not know if Janetos read the form.  Bakal-Lomena Tr. at 48.  Janetos testified that he thought Parais translated the statement, but did not recall seeing the words written in slanted font that had been inserted.  Janetos Tr. at 60.  Parais stated that Janetos did not read the statement before signing it. Parais Tr. at 18.  Regarding the form, Parais also stated that the "employees there, um, gave us a form saying it was to report that an accident had occurred at the store at that time.  Um, and that's

all they told us.  And they asked George to sign.  He signed using his left hand." Parais Tr. at 14.

She agreed that she was "the one primarily involved in terms of the accident report, other than

some basic info, such as [Janetos's] name." *Id*. at 16.

In addition to the Customer Incident Statement, Bakal-Lomena also filled out a General

Claim Liability Worksheet.  Bakal-Lomena Tr. at 31-32, 34; Pls.' Aff., Ex. K.  Under the pre-

printed heading "Describe what happened," she wrote "The last door was taken from stock &

doors that were sta[illegible] flat fell forwarded hitting customers right should[illegible]." *See*

Pls.' Aff., Ex. K.

Bakal-Lomena stated that Janetos refused her offer to call an ambulance.  Bakal-Lomena

Tr. at 37.  Parais and Janetos, however, testified that no ambulance was offered.  Parais Tr. at 14;

Janetos Tr. at 52.  After they left Home Depot, Parais and Janetos went to North Shore Hospital.

Janetos Tr. at 68-69.

### C.        Home Depot's Door Stacking Policies and Practices

The plaintiffs have submitted four photographs as attachment G to Plaintiffs'

Affirmation.  These are photographs of Home Depot doors with captions bearing the date

August 18, 2008 and the time of 9:25 a.m., as well as a claim number.  The record does not

reflect who took the photographs, but Joann Bakal-Lomena testified that she wrote the captions

on each one.  Bakal-Lomena Tr. at 41.  Bakal-Lomena, Parais, and Gregus agreed that the

photographs accurately reflect the doors on the date of the accident.  *See* Bakal-Lomena Tr. at 39,

43; Parais Tr. at 16-17;[1] Gregus Tr. at 27-28. Janetos could not remember whether the photographs were accurate. *See* Janetos Tr. at 66-67.

One of the photographs depicts a set of stacked doors with the thin part facing toward the aisle, in a bookcase fashion. *See* Pls.' Aff., Ex. G. The other photographs appear to depict the doors after they have fallen. *See id*. Silva, Gregus, and Bakal-Lomena all testified that the proper way to stack the doors was the bookcase manner and they all cited safety as the reason for this policy. Silva Tr. at 13-14; Gregus Tr. at 20-21; Bakal-Lomena Tr. at 41, 43-44.

Silva testified that Home Depot stacks doors in bays that are approximately eight feet wide and separated by what Home Depot refers to as "M bars." Silva Tr. at 21. Gregus testified that "[t]here had to be a cable in front of [the doors] that had to be locked at all times just in case of anything." Gregus Tr. at 15. Silva testified that he was not sure if there were cables to hold the doors at the time of the accident. Silva Tr. at 22. There are no cables visible in any of the pictures and none of the other witnesses testified regarding the use of cables.

Both Silva and Gregus testified that each morning, the opening manager at Home Depot does a "safety walk" to ensure, among other things, that merchandise is stacked properly. Silva Tr. at 22-24, Gregus Tr. at 17-18. According to Silva, the safety walk is usually done by 10 a.m. and sometimes there are customers in the store before the walk is complete. Silva Tr. at 23. The employee performing the safety walk has a check list to record the findings of the walk. *Id*.; Bakal-Lomena Tr. at 20-21.

---

[1]     Parais testified that there was no cart under the doors at the time of the accident, although a cart is pictured in the photographs.

Gregus testified that, as Department Manager, he would conduct the safety walk of the Millwork Department. Gregus Tr. at 17-18. He stated that he would do the walk "most mornings," *id*. at 18, and if he did not do the inspection, then another associate would have done it, *id*. at 65. Bakal-Lomena also testified that she would do morning safety walks and stated that she did one on the morning of the accident. Bakal-Lomena Tr. at 18. Although she was not positive, she thought the walk was completed prior to the time the accident occurred because managers typically try to complete this task as early as possible in the morning. *Id*. There was no testimony or other evidence in the record regarding the results of the safety walk in Aisle 23 on the day of the accident.

According to Gregus, if he ever encountered an unsafe situation, such as one where the doors were improperly displayed, he "would gate the aisle off and fix it immediately." Gregus Tr. at 22; *see id*. at 49. He further testified that he had seen doors improperly stacked face forward approximately five times over the course of his employment. *Id*. at 49.

### D. The Doors on the Date of the Accident

Janetos testified that on the day of the incident, in the bay of doors he was looking at, there was a front set of doors that was stacked in the bookcase fashion and a set of doors in the back that was stacked in a different manner with the whole door facing forward. Janetos Tr. at 32. The Customer Incident Statement refers to "doors stacked behind the front doors." Pls.' Aff., Ex. K. Although he did not prepare the incident statement, Gregus explained the meaning of the phrase "doors stacked behind the front doors" as follows:

> The way these doors are stacked right here, the guys put them face out behind them. I guess it was getting too late and they didn't have time to put them up top. I'm guessing when somebody pulled this last

8

> door out it opened the flood gates and these six or seven doors came
> falling down.

Gregus Tr. at 45.  The "guys" Gregus was referring to were members of the Home Depot night

crew who were sometimes tasked with restocking merchandise after hours.  *See* Gregus Tr. at

45-46.  Gregus further testified that "[i]t was stacked that way overnight, the shift was all most

over and it was going to take time to move around the equipment and put the doors in the over

heads.  So they just put it behind the ones on the floor."  Gregus Tr. at 53; *see also id.* at 29,

47-48, 53-55.  Gregus did not actually see anyone stack the doors in the manner described, but he

testified that he learned this information from a Home Depot employee in the Millwork

Department within a day or two of the accident.  Gregus Tr. at 53, 56.  He could not recall who

told him this information specifically.  *Id*. at 53.

Bakal-Lomena also testified that the doors were stacked improperly at the time of the

accident, but she didn't know when they got that way or how:

> I don't know – see, once we do our safety walk in the morning, we
> walk.  I have no clue if ten people were in that aisle and were looking
> at doors and changed – turning them when they were looking at them.
> I don't know at what point – obviously from these photos doors were
> definitely stacked improperly. . . . I mean, the store opens at 6 in the
> morning.  This accident happened at 9 something.  In that three hours,
> a – all it takes is one contractor coming in buying doors for a house
> job he's doing and takes down 20 doors and puts back up what he
> doesn't like because they look at them, make sure they're straight,
> make sure they are perfect doors and puts back up what he doesn't –
> what he's discharging.

Tr. at 45.[2]  Bakal-Lomena stated that she did not know if the night crew improperly stacked the doors.  *Id.* at 46.

## II.     LEGAL STANDARD

Fed. R. Civ. P. 56(a) dictates that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of establishing the absence of any genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that evidence in the light most favorable to the non-moving party.  *Doro v. Sheet Metal Workers' Int'l Ass'n,* 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).  "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."  *Id.*; *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even

---

[2]     Counsel for Plaintiffs stated on the record that she "move[d] to strike that portion which is not responsive," *see* Bakal-Lomena Tr. at 45; however, Plaintiffs submitted this portion of the deposition testimony and did not make any motion or refer to any objection.  Thus, the Court has included the statement here.

where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").  Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Dobbs v. Dobbs*, No. 06-CV-6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims") (internal quotation marks omitted).

## III.  DISCUSSION

### A.  Procedural Defects

Plaintiff's motion papers are procedurally defective on several grounds.  Initially, the Court notes that Plaintiffs' motion does not comply with the Local Rules of the Eastern District of New York in that Plaintiff's Rule 56.1 Statement of Undisputed Facts does not contain any citations to evidence in the record.  Local Rule 56.1(d) provides that "[e]ach statement by the movant or opponent pursuant to Rule 56.1 . . . must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Federal Rule of Procedure 56(c) provides that a party asserting that a fact cannot be or is genuinely disputed must support that assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce

admissible evidence to support the fact.

Plaintiff's purported Rule 56.1 Statement does not contain any citations to specific depositions, documents, electronically stored information, affidavits, discovery responses, etc. to support the proffer being made. In some instances, Plaintiffs' statement contains sentences styled as allegations, i.e., "Plaintiffs allege in their Verified Complaint . . . ." While Plaintiffs do refer to the testimony of witnesses in certain paragraphs, they do not specify the section or pages of the transcript which support the statement, and, in some instances, they fail to even identify the witness.

The deficient Rule 56.1 Statement is not the only procedural flaw. Other than citing cases which set forth the general standard for granting or denying summary judgment, Plaintiffs fail to cite a single case to support any legal argument in the context of the facts of this case. Moreover, while Plaintiff filed a Reply Affirmation, no Reply Memorandum of Law was submitted to address Defendant's legal arguments. The Reply Affirmation generally consists of legal argument, not factual information. Pursuant to Local Civil Rule 7.1, legal argument is to be set forth in a memorandum of law, while factual affirmation is to be set forth in affidavits. *See Dell's Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, No. 10-CV-3789, 2012 WL 3537009, at *1 n.3 (E.D.N.Y. Aug. 14, 2012); *Trustees of Local 7 Tile Indus. Welfare Fund v. Bennick Contracting, Inc.*, No. 07-CV-4992, 2010 WL 1424011, at *2 n.3 (E.D.N.Y. Jan. 22, 2010) (noting that legal argument in attorney affirmation was improper). Moreover, to the extent that the Reply Affirmation does contain factual statements, they are not made by any individual with first-hand knowledge of the facts, but rather by Plaintiffs' counsel. *See Risco v. McHugh*, –

F. Supp. 2d –, 2012 WL 2161115, at *1 n.2 (S.D.N.Y. June 14, 2012) (rejecting attorney

affirmation that was not based on personal knowledge).

Plaintiffs' papers are also deficient in the following respects:

- The Notice of Motion was filed three separate times. *See* DE 33, 35, 37.

- Plaintiffs' Affirmation was inexplicably filed in two separate pieces as exhibits to one of the Notices of Motion. *See* DE 37.

- The Rule 56.1 Statement was filed twice. *See* DE 34, 35-1.

- The Memorandum of Law was filed as an attachment to one of the Rule 56.1 Statements. *See* 34-1.

- The Memorandum of Law, Rule 56.1 Statement, and Plaintiffs' Affirmation were all filed as "Motions," an error which the Court has corrected.

If the Court were to rely solely on the materials cited by Plaintiffs, the motion would be

summarily denied because Plaintiffs' Rule 56.1 Statement does not provide the Court with a

basis for granting summary judgment. Although the Court is permitted to rely solely on the cited

materials, the Court may, however, also consider other materials in the record. *See* Rule 56(c)(3)

("The court need consider only the cited materials, but it may consider other materials in the

record."); *compare Romero v. City of New York*, 839 F. Supp. 2d 588, 596 (E.D.N.Y. 2012)

(considering entire record) *with Williams v. City of New York*, No. 10-CV-2676, 2012 WL

511533, at *3 n.3 (E.D.N.Y. Feb. 15, 2012 (disregarding evidence not cited by party). Because

the Court prefers to decide issues on the merits, and in the interest of judicial economy, the Court

will exercise its discretion and consider other materials in the record, including the exhibits

attached to Plaintiffs' Affirmation. *See* Fed. R. Civ. P. 56(c)(3). Plaintiffs' counsel is on notice,

however, that further submissions to this Court must comply with the applicable procedural rules and the failure to adhere to those rules will result in rejection of the submission.

## B. Substantive Law

Even if the sizable procedural flaws are set aside for the moment, the motion still fails on substantive grounds. Looking to the merits, the Court applies New York law to this diversity action because New York is the state in which the accident occurred. *See Luizzi v. Pro Transport Inc.*, No. 02-CV-5388, 2009 WL 252076, at *4 (E.D.N.Y. Feb. 2, 2009); *Ascher v. Target Corp.*, 522 F. Supp. 2d 452, 456 (E.D.N.Y. 2007). In order to establish negligence under New York law, a plaintiff must prove: (1) the existence of a duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) the breach was a proximate cause of the injury to the plaintiff. *Di Benedetto v. Pan Am World Servs., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004); *Irizarry v. Heller*, 95 A.D.3d 951, 952-53, 943 N.Y.S.2d 606 (2d Dep't 2012).

### 1. Duty

The parties do not discuss whether Home Depot owed a duty to Plaintiffs. It is well-settled, however, that a storekeeper owes a duty to its customers to keep the store in a safe condition. *See Maheshwari v. City of New York*, 2 N.Y.3d 288, 294, 778 N.Y.S.2d 442 (2004) ("New York landowners owe people on their property a duty of reasonable care under the circumstances to maintain their property in a safe condition."); *Higgins v. Ruppert*, 124 A.D. 530, 108 N.Y.S. 919 (2d Dep't 1908) ("[O]ne who invites the public to his place of business is under the duty of reasonable care to make his place safe to those who come."); *Abdelmessih v. Costco Wholesale*, 28 Misc. 3d 1205(A), 2010 WL 2670792, at *2 (N.Y. Sup. Ct. 2010).

In *Repecki v. Home Depot USA*, the court, in discussing this duty, explained that "a retail storekeeper is required to use reasonable care to prevent objects for which he is responsible from falling and causing injury to persons lawfully in the vicinity." 942 F. Supp. 126, 129 (E.D.N.Y. 1996). The court in *Repecki* noted that "[p]articularly in self-service stores, it is reasonably foreseeable that material stored and piled on high shelves may fall, striking a customer. *Id*; *see DeMartino v. Home Depot U.S.A., Inc.*, 37 A.D.3d 758, 759, 831 N.Y.S.2d 236 (2d Dep't 2007) (noting Home Depot's duty to maintain its premises in a reasonably safe condition); *Monge v. Home Depot, Inc.*, 307 A.D.2d 501, 502, 761 N.Y.S.2d 886 (3d Dep't 2003) (same). The Court concludes, therefore, that Home Depot owed Plaintiff a duty to maintain its store in a reasonably safe condition.

### 2. *Prima Facie Case of Negligence*

In order to establish a prima facie case of negligence in premises liability actions such as this one, a plaintiff must show one of the following: (1) the owner created the defective condition that caused plaintiff's injury; (2) the owner had actual notice of the condition; or (3) the owner had constructive notice of the condition. *See Greco v. Starbucks Coffee Co.*, No. 05-CV-7639, 2006 WL 1982761, at *3 (S.D.N.Y. July 14, 2006); *Pulinski v. Eckerd Corp.*, No. 03-CV-590, 2006 WL 581188, at *2 (W.D.N.Y. March 8, 2006) (citing *Gordon v. Am. Museum of Natural History*, 6 N.Y.2d 836, 837, 501 N.Y.S.2d 646 (1986)); *Ruggiero v. Waldbaums Supermarkets*, 242 A.D.2d 268, 268, 661 N.Y.S. 2d 37 (2d Dep't 1997). The Court will analyze each of these potential grounds for liability in turn.

### a.      *Whether Home Depot Created the Condition*

Plaintiffs claim it is "uncontroverted that defendant . . . improperly stacked and stored unsecured doors that struck the plaintiff . . . ."  Pls.' Mem. at 5.  Defendant, to the contrary, argues that there is "no evidence . . . as to how the doors got that way."  Def's. Mem. at 1.

The sole evidence presented to support Plaintiffs' theory of causation is the testimony of Michael Gregus.  *See* Pls.' 56.1 Stmt. ¶ 10.  Gregus testified that the night crew did not have time to stack the doors in an overhead space as they should have, so they stacked the doors behind a set of properly stacked doors.  Specifically, in response to a question about what the phrase "the doors stacked behind the front doors" meant in the Customer Incident Statement,[3] Gregus stated:

> The way these doors are stacked right here, the guys put them face out behind them.  I guess it was getting too late and they didn't have time to put them up top.  I'm guessing when somebody pulled this last door out it opened the flood gates and these six or seven doors came falling down.

Gregus Tr. at 45.   Continuing his testimony, Gregus stated as follows:

> Q:      In this particular Millwork Department, aisle twenty-three, where the incident took place, is there something by looking at Exhibit B [referring to the photos in Appendix A], can you tell us what was done the night before or not done the night before by the employees?[4]
>
> A:      There's nothing – just by these pictures I can't say it was overnight.
>
> Q:      It was done sometime though; correct?
>
> A:      Absolutely.

---

[3]      The Customer Incident Statement does not contain any information about who stacked the doors that hit Janetos.  *See* Pls.' Aff., Ex. K.

[4]      Counsel for Defendant objected on the grounds that the question called for speculation.

Q: What was done sometime that you could see from the pictures?

A: The doors were stacked behind the display doors instead of being put up in the overhead.

Q: Who could have done that?

A: Anybody who was doing the stock filling the shelves.

Q: That would be the employees of Home Depot?

A: Yes.

*Id*. at 47-48. The Court notes that Gregus's theory about how the doors came to be stacked the way they were was given in response to a hypothetical question and he himself referred to the theory as a "guess," *see id*. at 45. However, Gregus also provided the following explanation, which he testified he learned from another Home Depot employee within a day or two of the accident:

It was stacked that way overnight, the shift was all most over and it was going to take time to move around the equipment and put the doors in the over heads. So they just put it behind the ones on the floor.

*Id*. at 53; *see also id.* at 54-56. According to Gregus, the employee who provided this explanation worked in the Millwork Department, but Gregus could not recall the specific identity of the individual. *Id*.

While Gregus's narrative provides a plausible explanation for what may have occurred, it is not conclusive for summary judgment purposes. Gregus did not personally observe what happened to the stacked doors. To the extent that his theory was a "guess," as he initially indicated, the explanation is speculative at best. If the explanation was not a guess, but rather

17

was based on what another unidentified Home Depot employee told Gregus, then there are hearsay problems which Plaintiffs have not overcome. The Court cannot consider hearsay statements on a motion for summary judgment. *Davis-Bell v. Columbia Univ.*, – F. Supp. 2d –, No. 10-CV-4362, 2012 WL 946680, at *20 (S.D.N.Y. March 19, 2012); *Zinnamon v. NYC Dep't of Social Servs.*, No. 08-CV-5266, 2010 WL 3325264, at *5 n.5 (E.D.N.Y. Aug. 18, 2010); *see Abdelmessih*, 2010 WL 2670792, at *2 (applying New York law). Federal Rule of Evidence 801(d)(2)(D) provides an exception to the hearsay rule for statements made by a party's agent or employee, so called "vicarious admissions." However, Plaintiffs have not made any showing with respect to the elements of that exception, i.e., (1) the existence of the agency relationship, (2) that the statement was made during the course of the agency relationship, and (3) that it relates to a matter within the scope of the agency. *See Pappas v. Middle Earth Condo. Ass'n,* 963 F.2d 534, 537 (2nd Cir.1992). The Court notes that while the statements of unidentified declarants are typically excluded from this exception, *see Farganis v. Town of Montgomery,* 397 Fed. Appx. 666, 668 (2d Cir. 2010), Plaintiffs may be in a position to establish that there was an agency relationship between the declarant(s) and Home Depot through circumstantial evidence, *see Pappas*, 963 F.2d at 538 (finding agency relationship based on declaration of personnel manager); *Smith v. Pathmark Stores, Inc.*, 485 F. Supp. 2d 235, 238 (E.D.N.Y. 2007) (finding existence of agency relationship based on individual's name tag, accident investigation notes, and deposition testimony of other employees). On the other hand, if the statement by the other Home Depot employee was not based on personal observation, the hearsay problem is compounded.

Whether or not the statements are admissible at trial, as well as whether they will be accorded any weight even if admitted at trial, is an issue for another day. At this point, the Court

18

finds that Plaintiffs have not met their burden to demonstrate that the statements of the unknown declarants – the sole basis for Gregus's conclusion – are admissible. Gregus's testimony, therefore, is not a sufficient basis on which to grant summary judgment for Plaintiffs.

The testimony of Bakal-Lomena, though also not conclusive, suggests another theory of what happened. With regard to her general experience and how the doors came to be improperly stacked, Bakal-Lomena testified as follows:

> I don't know – see, once we do our safety walk in the morning, we walk. I have no clue if ten people were in the aisle and were looking at doors and changed – turning them when they were looking at them. I don't know at what point – obviously from these photos doors were definitely stacked improperly. . . . I mean, the store opens at 6 in the morning. This accident happened at 9 something. In that three hours, a – all it takes is one contractor coming in buying doors for a house job he's doing and takes down 20 doors and puts back up what he doesn't like because they look at them, make sure they're straight, make sure they are perfect doors and puts back up what he doesn't – what he's discharging.

Bakal-Lomena Tr. at 45. Bakal-Lomena clearly did not herself observe how the doors were stacked immediately prior to the accident. What her testimony does raise however, is the equally speculative prospect that a contractor or some other customer buying doors in the morning hours re-stacked the doors improperly. In *Rosado v. Home Depot*, 4 A.D.3d 204, 205, 772 N.Y.S.2d 268 (1st Dep't 2004), the court held that there were insufficient circumstantial factors to infer that the defendant created the hazard because the stack of planks which fell on the plaintiff were generally accessible to other shoppers. Here, similarly, the doors were accessible to other Home Depot shoppers prior to the accident. Consequently, there is an issue of fact whether a customer improperly stacked the doors that hit Janetos or whether a Home Depot employee created the hazardous condition.

### b.    Whether Home Depot Had Actual Notice of the Condition

There is no evidence in the record to suggest that Home Depot had actual notice of the dangerous condition.  Indeed, the evidence suggests that Home Depot had no such notice.  Bakal-Lomena, testified as follows:

> Q:    Had you gone to the millwork department at all before this occurrence that morning?
>
> Y:    Yes.
>
> Q:    What did you notice that morning before the incident occurred, if anything, in millwork?
>
> A:    Nothing out of the ordinary.

Bakal-Lomena Tr. at 17.  While the other Home Depot employees did not testify concerning the condition of the doors before the incident occurred, Silva, Gregus, and Bakal-Lomena all testified that Home Depot managers conducted "safety walks" every morning.  *See* Silva Tr. at 22-24, Gregus Tr. at 17-18, 31-32, 65, Bakal-Lomena Tr. at 20-21.  Plaintiff has not presented any evidence that there was knowledge or notice of an unsafe condition on the safety walk the morning of the accident.  Moreover, Gregus testified that the allegedly dangerous condition was not visible to passersby.  *See* Gregus Tr. at 49 ("I didn't see it unless I dug under and went through little holes there was no way to look – .").  Consequently, Plaintiffs have not established that Home Depot had actual notice of the improperly stacked doors and this question must be resolved by a jury.  *See Greco*, 2006 WL 1982761, at *3 (finding no actual noticed where plaintiff failed to produce evidence that any of defendants' employees noticed puddle); *Abdelmessih*, 2010 WL 2670792, at *2 (granting summary judgment for the defendant because there was no evidence that the defendant had notice that drill cases were improperly stacked).

### c. Whether Home Depot Had Constructive Notice of the Condition

"An owner can be deemed to have constructive notice of a dangerous condition if it is visible and apparent, and if the condition existed for enough time before the accident to permit the owner's employees to discover and remedy the problem." *Pintor v. 122 Water Realty, LLC*, 90 A.D.3d 449, 451, 933 N.Y.S.2d 679 (1st Dep't 2011); *accord Greco*, 2006 WL 1982761, at *3.

Based upon the purported "facts" presented by Plaintiffs at this juncture, the Plaintiffs have not established that Home Depot had constructive notice of a dangerous condition prior to the accident. No testimony, affidavits, or documentary evidence have been presented to show conclusively that the doors were improperly stacked long enough for a Home Depot employee to discover and remedy the problem. Although Gregus testified that the doors were stacked improperly the night before the accident, the Court has already ruled on the speculative nature of that testimony. It is equally "possible" that one of the customers viewing the doors prior to Janetos and Parais handled and arranged them in a dangerous manner. *See Ruggiero*, 242 A.D.2d 268, 268 (noting the possibility that a customer jostled the cans at issue shortly before the fell). In the absence of direct or circumstantial evidence, the Court cannot and will not speculate as to how long the dangerous condition existed. *Ascher*, 522 F. Supp. 2d at 462 (rejecting constructive notice argument that was based on speculation about how long the defective condition existed); *Abdelmessih*, 2010 WL 2670792, at *2. Thus, Plaintiffs have not substantiated that Home Depot had constructive notice of the condition because they have not demonstrated a factual basis which makes it reasonable to conclude that such condition was visible, apparent, and in existence for a long enough period to permit Home Depot employees to discover and remedy the problem.

Even if the dangerous condition was present from the night before as Gregus proffered, there is no evidence that the condition was visible and apparent to Home Depot employees. If the improperly stacked doors were stored behind properly stacked doors, as Gregus's testimony seems to suggest, then it is unlikely that the improperly stacked doors were visible to Home Depot employees. Gregus appeared to acknowledge this fact. When asked why he "missed" the fact that the doors were improperly stacked, he explained: "I didn't see it unless I dug under and went through little holes there was no way to look – ." Gregus Tr. at 49. Moreover, Janetos testified that there was nothing which warned him that there could be an accident when he approached the doors, further suggesting that the dangerous condition was not visible. Janetos Tr. at 34.

A plaintiff can also establish constructive notice by showing that the defendant had actual knowledge of a recurring problem in the area where the accident occurred. *See Greco*,, 2006 WL 1982761, at *3. Although Gregus testified that he had seen doors stacked face forward in the improper way approximately five times during his employment, Gregus Tr. at 49, Silva testified that he had never heard of a similar incident involving merchandise falling over because it had been stored improperly, Silva Tr. at 19. The fact that one employee viewed an allegedly similar dangerous condition on other occasions is not conclusive on the issue of whether Home Depot had actual notice of a dangerous condition existing in the area at the time before the accident occurred. *See Kokin v. Key Food Supermarket, Inc.*, 90 A.D.2d 850, 851, 935 N.Y.S.2d 66, 67 (2d Dep't 2011) (holding that general awareness of slippery condition of aisle was insufficient to establish constructive notice); *Joseph v. New York City Transit Auth.*, 66 A.D.3d 842, 843, 888 N.Y.S.2d 533, 534 (2d Dep't 2009) (holding that general awareness of wet and slippery condition

of staircase was insufficient to establish constructive notice as to particular condition that caused the plaintiff to fall); *McLaughlan v. Waldbaums, Inc.*, 237 A.D. 335, 336, 654 N.Y.S.2d 406, 407 (2d Dep't 1997) (finding a triable issue of fact on the constructive notice issue where employee testified that bottles would occasionally fall off the display at issue when customers removed bottles from bottom of display). Thus, Plaintiffs have not demonstrated, on the evidence presented to date, that Home Depot had actual knowledge of a recurring problem in the area where the accident occurred and this issue remains for the trier of fact.

### 3. *Res Ipsa Loquitur*

In addition to arguing that Home Depot created the condition, Plaintiffs also rely on the doctrine of *res ipsa loquitur*. Under New York law, the phrase *res ipsa loquitur* refers to the proposition "that the fact of the occurrence of an injury, and the surrounding circumstances, may permit an inference of culpability on the part of the defendant, make out plaintiff's prima facie case, and present a question of fact for the defendant to meet with an explanation." *Weeden v. Armor Elevator Co.*, 97 A.D.2d 197, 203, 468 N.Y.S.2d 898 (2d Dep't 1983) (internal quotations omitted). Since this doctrine merely permits an inference of negligence, a plaintiff will only be entitled to summary judgment based on the doctrine of *res ipsa loquitor* in the rarest of cases. *Mallette v. MarineMax, Inc.*, 778 F. Supp. 2d 282, 290 (E.D.N.Y. 2011); *Morejon v. Rais Constr. Co.*, 7 N.Y.3d 203, 209, 818 N.Y.S.2d 792 (2006). Plaintiffs have not established the necessary elements of the doctrine, nor have they demonstrated that this case involves any rare circumstances which would justify the granting of summary judgment based on *res ipsa loquitur*.

In order for *res ipsa loquitur* to apply, a plaintiff must demonstrate that: (1) the event is of a kind which normally does not occur in the absence of someone's negligence; (2) the event was

caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the

event must not have been due to any voluntary action or contribution on the part of the plaintiff.

*Espinal v. Trezechahn 1065 Ave. of the Ams., LLC*, 94 A.D.3d 611, 614, 942 N.Y.S.2d 519 (1st

Dep't 2012). "It is settled that objects in a retail store are not under the exclusive control of the

store." *Ascher*, 522 F. Supp. 2d at 457; *see Pintor v. 122 Water Realty, LLC*, 90 A.D.3d 449,

451, 933 N.Y.S.2d 679 (1st Dep't 2011) (holding that doctrine did not apply where others had

access to the apartment where the accident occurred); *Rivera-Emerling v. M. Fortunoff of

Westbury Corp.*, 281 A.D.2d 215, 217, 721 N.Y.S.2d 653 (1st Dep't 2001) (holding that doctrine

was inapplicable where innumerable shoppers had access to chair that caused injury); *Repecki*,

942 F. Supp. at 129 (holding that *res ipsa loquitor* did not apply because the defendant did not

have exclusive control over lumber boards in bin that caused injury). In contrast, where access to

the object that caused the injury is restricted, the doctrine may apply. *See Fields v. King Kullen

Grocery Co.*, 28 A.D.3d 513, 514, 813 N.Y.S.2d 495 (2d Dep't 2006) (reversing ruling that *res

ipsa loquitor* was inapplicable because grill that caused injury fell from a shelf 6 ½ feet above the

ground and there were no ladders or stills that customers could have used to reach it).

Plaintiffs have not demonstrated that the doors which caused the injury were inaccessible

to customers. Indeed, Plaintiff Janetos testified that the "front" doors on Home Depot's sales

floor were accessible to customers to touch and move. Janetos Tr. at 63-64. Although it may

seem less likely that customers would rearrange multiple doors weighing between 30 and 50

pounds each, *see* Silva Tr. at 27, Gregus Tr. at 26, the circumstances here tend to beg the

question why, if the doors were improperly stacked by Home Depot, they did not fall until

Janetos and Parais approached them. Indeed, Janetos's testimony that the doors fell within

24

seconds of the time the prior customers left the space and Janetos and Parais approached the doors supports an equivalent inference that the doors were improperly stacked by the customers who viewed the doors immediately prior to Janetos and Parais. *See* Janetos Tr. at 29. Without reaching any conclusions regarding which scenario actually occurred, the Court finds that Plaintiffs have not established that the doctrine of *res ipsa loquitor* entitles them to summary judgment.

### 4. *Contributory Negligence/Comparative Fault*

Defendant argues that summary judgment should be denied unless the Court "can also find, as a matter of law, that George Janetos had no fault of his own." Def's. Mem. at 13. The issue of comparative fault is not a bar to recovery, but rather, if proven, will allow a reduction in damages in proportion to plaintiff's fault. *See* CPLR 1411 ("the culpable conduct attributable to the claimant . . . shall not bar recover, but the amount of damages otherwise recoverable shall be diminished [proportionateley]"). Since Plaintiffs have moved for summary judgment on the issue of liability only, Janetos's comparative fault does not figure into this decision. The Court notes that even if the issue of comparative fault had been properly brought before the Court, Defendant has the burden of proof on the issue of Janetos's comparative fault, *see Allison v. Rite Aid Corp.*, 812 F. Supp. 2d 565, 569 (S.D.N.Y. 2011), and Defendant has failed to point to any evidence to support a finding of comparative fault. "A customer in a store is bound to use reasonable care for his own safety, particularly when he becomes aware of a dangerous condition existing which requires him to use this care," *Repecki*, 942 F. Supp. at 130. The question of whether Janetos acted with reasonable care or was aware of a dangerous condition is still an open question for a jury. Indeed, Janetos testified that he did not see any doors leaning out of the

section or anything else that would have alerted him that there could be an accident. Janetos Tr. at 34. Thus, Home Depot's argument that summary judgment should be denied due to Janetos's comparative fault is unavailing.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED.

**SO ORDERED.**

Dated:      Central Islip, New York
            September 13, 2012

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge